DE RISO BROS., INC., Claimant, *v.* THE STATE OF NEW YORK, Defendant.

(Claim No. 18998.)

Court of Claims, February 5, 1937.

Benjamin McClung, Charles B. Sullivan and A. J. Asche, for the claimant.

John J. Bennett, Jr., Attorney-General [Joseph I. Butler, Assistant Attorney-General, of counsel], for the defendant.

BARRETT, P. J. On July 27, 1925, claimant entered into a contract with the State of New York acting through the State Hospital Commission, for the construction of fifteen buildings, including tunnels and corridors, for an addition to Brooklyn State Hospital, Creedmoor Division, Long Island, N. Y., for the sum of $3,287,-900. The contract was officially approved by the Comptroller on August 25, 1925. On July 27, 1925, claimant was notified of the acceptance of its proposal, by the State, and in the letter of notification it was said: " This is the authority for beginning work." Work under the contract was actually begun on September 21, 1925. Under the contract the work was required to be completed on or before August 1, 1927. The work was actually completed about April 1, 1928, and the application for payment of the final estimate was made on May 8, 1928, and final payment was made on June 5, 1928. This final payment was made under protest and with the proper reservation of the right to make this claim.

The claim in brief is for breach of the contract, by reason of the failure of the State to furnish temporary heat, in accordance with the terms of the contract, thereby causing delays and extra expenses in the performance of the work and for extra expenses incurred by the rejection of the screens allegedly made in accordance with the terms of the contract. The two largest buildings designated by the letters (L) and (M) were built from the same plans. They consisted of three stories and basement, of brick and reinforced concrete construction. The roof was constructed of a composition known as nailcote. Each of these buildings had a perimeter of about 1,600 feet. They were to be used for the occupancy of the inmates. The building designated with the letter (N) was a one-story building, to be used as a dining hall, connected with buildings (L) and (M) by closed corridors. Building (Y) was a two-story building designed to be used as a fire house. The other buildings to be constructed were of substantially the same construction with the exception that a few of them had slate covering over the nailcote roof. Their designations and respective uses and construction were as follows:

| Building | Use | Construction |
|---|---|---|
| A | Administration | Two-story and basement |
| B, C, H, I, K, | Employees' quarters | Two-story and basement |
| Y | Fire house | Two-story |
| T | Cold storage | Two-story |
| X | Vegetable storage | Two-story |
| EE, FF, HH, | Doctors' quarters | Two-story frame |

Under the contract claimant was also to build tunnels of reinforced concrete from the existing power house to the new buildings for the purpose of carrying the heating mains. Heat was to be carried to the smaller buildings, located in what is called the west field, through pipes laid in trenches. Claimant's contract did not include the heating mains for the tunnels nor the trenches or the piping leading to the buildings in the west field. There is no dispute as to the times when temporary heat was supplied. As to building (M) it was not supplied until December 21, 1926; as to building (L) heat was furnished on January 12, 1927. In building (Y) heat was supplied on November 19, 1927, and in building (N) on January 27, 1927. As to the other buildings located in the west field, temporary heat was first supplied on November 23 and November 25, 1927. It appears from the testimony that in the locality where these buildings were constructed, weather conditions made heat necessary for interior construction from October fifteenth to April first.

The material portions of the contract, so far as temporary heat is concerned, are as follows (Specifications, P.i and 1 a):

" Temporary heat will be supplied by the Institution from the time the building is enclosed until the completion of this contract, whenever such heat is necessary for the prosecution of the work. A temperature of approximately 70 degrees F. shall be maintained for painting and varnishing work or the laying or waxing of linoleum and not less than 50 degrees F. at other times. Temporary connections and radiators will be made by the Heating Contractor * * *.

" The Heating Contractor will install all apparatus, piping and radiation temporarily connected and will operate the heating system during periods when heat is required."

On page 14 of the general specifications of labor and materials required for the construction of buildings B, C, H, I, K, it is provided:

" Steam for temporary heat will be supplied by the institution from the time the building is enclosed until the completion of the contract, whenever such heat is necessary for the prosecution of the contract. Temperature of approximately 70° F. shall be maintained for varnishing and painting work or the laying and waxing of linoleum and not less than 50° F. at other times. Temporary connection of radiators will be made by the heating contractor but this contractor shall be held responsible for damage to any portion of the heating system within the building, caused by workmen employed in the execution of this contract.

" The heating contractor will install all apparatus, piping and radiation temporarily connected and will operate the heating system during the periods when temporary heat is required."

This provision is also included in the specifications for buildings A, L, M, N, L, X and Y and appears on page 1 of the general description in the specifications for buildings EE, FF, HH, it being also provided that the heating contractor is to make all temporary connections for the temporary heat. All of these provisions are in substantially the same language, except that in one part of the specifications the words " steam for " precede the words " temporary heat." I can see no difference in the effect of these provisions. They mean that the heat produced by steam from the power house would be provided when necessary.

There is some dispute in the testimony as to when the State was notified that heat was necessary. The claimant's contention in that regard being that prior to October 15, 1926, its representative had several conversations with State employees relative to the failure to furnish such heat. That these conversations were had was admitted by the State but as of November or December and not prior to October 15, 1926.

On November 22, 1926, the State Architect wrote the surety company on the bond of the heating contractor in reference to the slow progress of the contract and in said letter stated: " The Gillis & Geohegan Company have known for several months that heat would be required in at least a portion of the buildings at Creedmoor during the coming heating season. Proper precautions should have been taken several weeks ago to supply all necessary materials for this work. It is evident, however, that this has not been done." This would seem to give corroboration to claimant's contention that heat was demanded before October 15, 1926. It is also apparent that serious damage might be caused to the interiors of the buildings by reason of the failure to furnish heat when the weather required it. This is also referred to in the letter from which the above quotation is taken.

The real dispute in this case is as to whether construction upon these buildings had progressed in October, 1926, so that heat was necessary. There is a mass of testimony upon this question and many photographs have been introduced showing the condition of the buildings at various degrees of construction. As to when a building is regarded as inclosed within the provisions of the contract it is provided on page 106 of the specifications as follows:

" Temporary Enclosures. Whenever necessary after a building is *enclosed*, to maintain proper temperature for the prosecution of the work, contractor shall furnish and maintain temporary enclo-

sure for all openings in exterior walls that are not enclosed with finished materials. Temporary enclosing materials shall be matched lumber, old doors and sash, or cloth stretched on wood frame.

" The enclosure shall be such, and so installed that they will afford ample and convenient means of entrance and exit for persons having business within the buildings; shall afford ample light to permit continued progress on all portions of the work, and shall exclude all inclement weather. If necessary, to fulfill the above conditions, cloth enclosures shall be given a coating of spar varnish or other suitable weatherproofing liquid."

As to building (N), claimant contends that on October 15, 1926, it was fully inclosed in that the concrete foundations, fireproofing, including roof arches, common face brick, structural steel, window frames, door frames, exterior steel, exterior sash, temporary exterior doors, roof and exterior glass were all complete and that the plastering in this building prior to October 15, 1926, was about forty per cent completed. The district supervisor of building construction, testifying for the State, admitted that this building was entirely inclosed with the exception of some basement windows. It is significant that the State produced no photographs of the condition of this building at the time mentioned. It is also apparent that even if these basement windows were open, they would have been inclosed permanently or temporarily very quickly and I agree with the claimant's contention that the failure, if there was such a failure, to make permanent or temporary inclosures of all of the basement windows long before the State was in position to make temporary heating available, affords no defense. Temporary heat, I am satisfied, was necessary in this building and was not furnished as the contract required.

As to building (L), it is claimant's contention that on October 15, 1926, the walls had been completed, the roof slab had been poured and the sash with few exceptions was in. Temporary heat was not furnished in this building until January 12, 1927. Photographs introduced in evidence by the State, taken on October 1, 1926, or about two weeks prior to the time when it is claimed heat should have been had, show that the steel for the roof was in place and also the forms for pouring nailcote roof slabs. Two other photographs taken October 22, 1926, show that the roof of this building had been completed, although some scaffolding was still on top and about the building. Other photographs introduced by the State, taken November 2, 1926, show that the roofs on this building were completed and that most of the windows were glazed. It is true that there were some window openings in this building which had not been inclosed, but the building was substantially com-

pleted in November, 1926. The materials for whatever completion was necessary were on hand and could have been quickly installed. As to this building heat was not supplied as the contract required.

Claimant's witnesses testified that building (Y) was inclosed prior to October 15, 1926, and heat to this building was not furnished until November 19, 1927. As a matter of fact the State had no means of supplying heat to this building during the winter of 1926–1927. There were some openings in this building after October 15, 1926, but I am satisfied that they could have been quickly inclosed, if heat had been available. Building (M) was substantially inclosed by December 1, 1926, but heat was not furnished until January 27, 1927. As to building (M), from the testimony I am satisfied that this building was ready for heat about December, 1926, but heat was not furnished until January 27, 1927. As to the buildings in the west field designated as A, B, C, H, I, K, no temporary heat was furnished during the winter of 1926–1927 and it satisfactorily appears, I think, that these buildings were substantially inclosed between January 15, 1927, and March 1, 1927, and that the heat was first supplied on November 25, 1927. It is significant in this connection that the State produced no photographs of these six buildings. As to the other buildings EE, FF, HH, T and X, temporary heat was not furnished until November 23 and November 25, 1927, and it is apparent from the testimony that these buildings were sufficiently inclosed long before that time.

However, there are other provisions of the contract to which the State has called attention and which must be considered in connection with the question as to whether an award should be made. These provisions are as follows:

Delays. Article 33 of the general conditions of the contract: " If the contractor be delayed in the completion of the work by any act or neglect of the State, or by changes ordered in the work, or by any cause which the architect shall deem to justify the delays as being beyond the contractor's control then the time of completion shall be extended for such reasonable time as the architect may decide.

" No such extension shall be made for delay occurring more than seven days before claim therefor is made in writing to the architect. In the case of a continuing cause of delay, only one claim is necessary."

Damages. Article 36 of the general conditions of the contract: " No charges or claim for damages shall be made by the contractor, under the provisions of this article, for any delays or hindrances for any cause whatsoever, during the progress of any portion of the work embraced in this contract. Such delays or hindrances shall be compensated for under the provisions of Article 33."

Separate contracts. Article 38 of the general conditions of the contract: " The State reserves the right to let other contracts in connection with this work. The contractor shall afford other contractors reasonable opportunity for the introduction and storage of their materials and the execution of their work and shall properly connect and coordinate his work with theirs."

Claimant contends that all of the work under the contract, if heat had been furnished, would have been performed by August 1, 1927, when as a matter of fact the work was not finally accepted and payment made until about June 5, 1928, or a delay of approximately forty weeks, and the damages sought under this part of the claim, amounting to the sum of $91,387.28, are for the expense of maintaining and employing men and the rental value of materials and equipment and overhead expenses for that period of time.

As to the damages for delays, the State relies upon *Wright & Kremers, Inc., v. State* (238 App. Div. 280; affd., 263 N. Y. 615), in which case it was said by the Appellate Division (on p. 261): " Leaving out of consideration delays caused by claimant or its subcontractors, the only relief available to the claimant for delays resulting ' from any cause whatsoever ' was an extension of claimant's time for completion. Since it appears that none of the delays caused by the State was unrelated to the contract or not within the contemplation of the parties (*Johnson* v. *City of New York*, 191 App. Div. 205; affd., 231 N. Y. 564); that none was caused by direct interference on the part of the State (*Waples Co.* v. *State of New York*, 178 App. Div. 357); and that none of the delays was so great or unreasonable that it might fairly be deemed to indicate an abandonment of the contract (*People ex rel. Wells & Newton Co.* v. *Craig*, 232 N. Y. 125, 144; *Brady & Co.* v. *Board of Education*, 222 App. Div. 504), the claimant is concluded by the portions of the contract referred to. (*Norcross* v. *Wills*, 198 N. Y. 336; *Mechanics' Bank* v. *City of New York*, 164 App. Div. 128; *Mack* v. *State of New York*, 122 Misc. 86; affd., 211 App. Div. 825.)"

The situation here, I think, is different from that in the case cited. Here the State in its contract agreed that temporary heat would be supplied when necessary, and its failure to keep its agreement resulted in active interference on the part of the State. In the case cited, the Court of Appeals held that the failure of the State to make part of the site available to the contractor when needed was a breach of the contract. I am inclined to agree with the claimant herein in its contention that the failure of the State to furnish temporary heat which it agreed to furnish from its own power house, when such heat was necessary to maintain specified temperatures, was a breach of the obligations of the

contract.   Nor do I think that claimant is precluded by the case of *Cauldwell-Wingate* v. *State* (156 Misc. 901), recently affirmed by the Appellate Division, Third Department (249 App. Div. 892), in which it was held that as the work of the contract was contingent upon the execution of the foundation work there was no breach of the contract, because it took longer to complete the foundations than was anticipated in that subsoil conditions were encountered, the existence of which might have been discovered by proper investigation at the time the proposal for the work was submitted. Here claimant had no reason to anticipate that the State would not furnish heat as provided in the contract.

" The contractor had a right to rely on the good faith of the State and to expect that the contract would be construed in a reasonable and fair way." (*McEligot* v. *State*, 246 App. Div. 121, at p. 125.)

The completion date of the contract was extended twice at the request of the claimant, in one case for one month on account of trouble in procuring steel, and in the other instance for a period of sixty-one days on account of cold or wet weather.

As to the requirement of the contract that the claimant should properly connect and co-ordinate with other contractors, there was no failure upon the part of claimant to comply with the provision of the contract.   Certainly it could not be expected to wait indefinitely because of this requirement of co-ordination, for the turning on of heat so necessary to the work.

Claimant is entitled to an award but not for the sum requested. While the contract was awarded on July 27, 1925, and while claimant was authorized on said day to begin work, it actually did not begin its operations until about September 21, 1925.   If it had begun its work when authorized to do so, much of the interior work, which was delayed by the failure to furnish the heat, might have been completed prior to October 15, 1926.   It is difficult to determine definitely for what period of time the claimant is entitled to recover.   It seeks damages for delays covering approximately forty weeks, amounting to $91,387.28, including the sum of $4,250 discussed hereafter.

Taking into consideration the delay in starting the work, the allowance of time necessary for its proper inspection after completion, the extensions of time granted by the State at the request of claimant, and incidental delays for which the State is not responsible, I have concluded that claimant is entitled to damages for delays amounting to five months or approximately twenty-two weeks, or the proportionate sum of $86,967.28, which amounts to $47,776.96.   In reference to the allowance of time for inspection

it appears, as stated before, that the work was actually completed about April 1, 1928, and the application for final payment was not made until May 8, 1928, or over a month thereafter. Surely the State is not to blame for that delay, nor is it to blame for the delay in making the final payment, which was made on June 5, 1928. This delay was not unreasonable in view of the magnitude of the work.

The sum of $4,250 is asked for damages caused by being compelled to put in partition work by patches, instead of co-ordinating the same with the plumbing work, the claim being that if temporary heat had not been delayed, this work would have been completed by April 1, 1927, but, on account of such delay, it had to be done after April 1, 1927, when a plumbing strike was in progress. Whatever damages there were, under this item, were caused by a strike of plumbers, and the State cannot be held to anticipate that such a condition might arise. If there had been no such strike there would have been no such damages. The item is disallowed.

Claimant also seeks to recover the sum of $2,250 expense incurred by reason of the alleged wrongful rejection of screens which claimant says were manufactured in accordance with the specifications and which rejection required him to furnish other screens. This item of $2,250 is allowed. It appears that the original contract drawing shows that the width of the face plate to be attached to the screens was one and one-quarter inches and there was nothing to indicate the spacing of the bolts around the screens which hold the netting in place. A sample of a proposed screen was prepared by claimant's subcontractor which sample had a face plate of one and one-quarter inches but did not show the actual spacing of the bolts. This sample was rejected and a new sample required having bolts placed not over six inches apart and with a frame somewhat wider than called for in the contract. In order to place these bolts six inches apart it was necessary to procure extra materials and perform extra labor with additional tools. After the screens had been made and shipped, the State Architect made an additional drawing changing the screens. This drawing was somewhat different than the contract drawings in that an adjustable offset plate was required in connection with the lock-box consisting of a piece of metal one and one-quarter by six or eight inches long and made to slide up and down over the bottom of the lock-box. To do this work extra plates, screws and tools and additional drilling work were required. In the meantime 1,350 screens had been made and shipped and some of them placed. They were taken down and returned to the subcontractor. The fair and reasonable cost of this additional work and extra materials amounted to the further

sum of $1,730. The subcontractor made a claim against the claimant in the sum of about $3,400, which was compromised for $1,750. The fair and reasonable value of the services of an attorney engaged to defend said claim was $500, or a total of $2,250. An award is directed for the sum of $50,026.96, with interest. Requests to find are not marked. They are deemed refused if not embodied in the decision. (Civ. Prac. Act, § 439.)

RYAN, J., concurs.